IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILLIP GARRY BETHONEY,

     Plaintiff,

vs.                                   Civ. No. 05-0050 JP/DJS

CONTINENTAL CASUALTY COMPANY
and HI ROBERTS,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On November 30, 2005, the Defendants filed a Motion for Summary Judgment or in the Alternative for Judgment on the Administrative Record (Doc. No. 28).  Although the Tenth Circuit has resolved ERISA lawsuits in a summary judgment posture, it is more appropriate for the Court to review the administrative record as an appellate court would.  *See Panther v. Synthes (U.S.A.)*, 380 F.Supp.2d 1198, 1207 n.9 (D. Kan. 2005).  Consequently, the Court will treat this motion as Defendants' request in the alternative, namely, as a motion for judgment on the administrative record.  The Court also notes that this motion for judgment on the administrative record applies only to Defendant Continental Casualty Company (CNA).  *See* Memorandum Opinion and Order (Doc. No. 68), filed June 2, 2006 (the proper ERISA defendant in this case is CNA).  Having reviewed the administrative record, the briefs, and the relevant law, the Court finds that 1) CNA's motion for judgment on the administrative record should be denied; 2) Plaintiff's ERISA claims against CNA should be remanded to CNA for further findings; and 3) Plaintiff's request for attorney's fees and costs should be denied at this time.

A. Background

Plaintiff became ill with fibromyalgia[1]  in August 2002. At that time Plaintiff was working as a used car sales manager at Bob Turner's Ford Country (Turner).  Plaintiff ended his employment with Turner on October 29, 2002 due to his illness.  AR 0152.

Plaintiff received short term disability benefits from CNA through April 27, 2003 based on Plaintiff's "continued reports that [his] overall functional capacity remained less than that, [sic] which is required of [Plaintiff] to perform the material and substantial duties of [his] regular occupation and; because [Plaintiff was] actively undergoing initial diagnostic work-ups and consultations with medical professionals and specialist [sic] with relation to [his] reported symptoms."  AR 0153.  CNA, however, subsequently denied Plaintiff's request for long term disability (LTD) benefits.

1.  Plaintiff's Disability Insurance Policies with CNA

Under Plaintiff's LTD insurance policy, CNA defined "disability"as follows:

"*Disability*" means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

1.  continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and

---

[1]"Fibromyalgia is a controversial diagnosis because it is diagnosed entirely from a patient's self-reports of pain and reported symptoms.  There are no laboratory tests for the presence or severity of fibromyalgia.  Symptoms include poor sleep, anxiety, fatigue, and irritable bowel syndrome.  The predominant symptom, however, is chronic widespread pain in the fibrous tissues, muscles, tendons, ligaments, and other sites, especially in the neck, shoulders, thorax, lower back, and thighs.  The onset of fibromyalgia is gradual and its cause is unknown. ...  If a patient has (1) a history of widespread pain for at least three months and (2) pain in 11 of 18 tender points on digital palpation, the patient will be said to have fibromyalgia."  *Reeves v. UNUM Life Ins. Co. of America*, 376 F.Supp.2d 1285, 1294-95 (W.D. Okla. 2005)(citations and internal quotations omitted).

> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

AR 0023. The CNA short term disability insurance definition of "disability" also includes the language "continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*...." AR 0041.

Plaintiff's LTD policy with CNA requires that Plaintiff provide proof of disability including objective medical findings before CNA can award LTD benefits. AR 0030-31. "Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine for [Plaintiff's] disabling condition(s)." AR 0031. Plaintiff must also provide CNA with "[t]he extent of [his] disability, including restrictions and limitations which are preventing [him] from performing [his] *Regular Occupation*." AR 0031. The CNA short term disability insurance requires the same proof of disability, restrictions, and limitations. AR 0045.

2. Summary of Events

On January 21, 2003, Plaintiff's primary care physician, Dr. John Easter, wrote a letter indicating that Plaintiff has "had persistent myalgias and arthralgias and symptoms consistent with chronic fatigue" since August 2002 when Plaintiff appeared to have had "an episode of serum sickness in reaction to Keflex." AR 0074. Dr. Easter noted that although Plaintiff had seen several specialists and had taken two or three courses of Prednisone therapy, an etiology for Plaintiff's symptoms was still unclear. *Id.* In fact, Dr. Easter stated that "[t]he patient is still symptomatic and has not been able to work for over two months due to the severity and persistence of his symptoms." *Id.* Dr. Easter noted that Plaintiff had an appointment to see Dr.

Michael Hogan at the Mayo Clinic in Scottsdate, Arizona.  *Id.*

The Plaintiff saw Dr. Hogan at the Mayo Clinic on January 28, 2003.  Dr. Hogan found that Plaintiff's "symptoms are compatible with a fibromyalgia-type syndrome" and that Plaintiff suffered from fatigue and gastroesophageal reflux disease.  AR 0080.

David Smith, a CNA employee, subsequently interviewed the Plaintiff on February 21, 2003.  Plaintiff told Mr. Smith that he could not sit at a computer for more than 30 to 35 minutes. AR 0298.  Plaintiff also stated that he could not return to his former job because of the standing required and the 48 to 60 hour work weeks.  *Id.*  Plaintiff noted that he wanted to go back to work but the fatigue would not allow him to do so.  AR 0299.

On February 27, 2003, the Plaintiff saw a physical therapist at the Mayo Clinic in Scottsdale.  During the physical therapy session, the Plaintiff stated that although he has held "executive level type jobs" those jobs included "running around" in addition to being "desk" jobs. Ar 0077.  Plaintiff further stated that he had been working about 10 to12 hour days.  *Id.*  The physical therapist indicated that Plaintiff's daily activities were limited due to "muscle performance issues."  AR 0078.

On March 13, 2003, Dr. Easter wrote a letter on behalf of Plaintiff stating:

The ultimate diagnosis obtained at the Mayo Clinic was that the patient had fibromyalgia. The patient has severe, and at times debilitating, muscle achiness, especially across his back.  This has prevented him from being able to work at his previous employment.  He has also been struggling with some depression related to this illness and its restrictions on his previously active lifestyle.  He is currently undergoing [an] extensive physical therapy program designed by the Physical Therapy Department at Mayo Clinic, Scottsdale.  The patient is working hard at improving his condition and doing all that he can with exercise and therapy to minimize and deal with his symptoms.  However, at this point the prognosis for any significant improvement is guarded.  He will, of course, be reevaluated periodically and will continue to go to the Mayo Clinic, Scottsdale.  If you have need for any further expert opinions that are necessary, I would recommend that you contact his physicians

4

there.

AR 0075.

CNA then conducted a Claimant Interview with Plaintiff on April 10, 2003.  Plaintiff stated to the interviewer that "[h]e can not [sic] sit for more than 40 minutes without having to get up and change positions, he can not [sic] stand for more than 10 to 15 minutes.  He has been walking everyday per his therapist and is now up to 24 minutes."  AR 0294.  Plaintiff also stated that if he does not sleep well he takes a 2 to 3 hour nap.  *Id*.  Plaintiff's daily activities included taking his son to and from school, "puttering" around the house, running errands for his wife, watching television, and using the computer for about 30 minutes before experiencing pain.  *Id*.  Plaintiff's physical therapy consisted of stretching for 20 minutes a day and walking.  AR 0295.  The interviewer observed that Plaintiff was eager to go to work and wanted to try part-time work although Plaintiff's "therapist [had] told him that he should not return to such a stressful environment."  *Id*.

On April 15, 2003, Sandie Alexander, Turner's office manager, filled out a Physical Demands Analysis for Plaintiff.  Ms. Alexander indicated that in order for Plaintiff to carry out his job duties he had to be able to walk the seven acres of the dealership lot and work 12 to 14 hours a day, six to seven days a week.  AR 0263.  Ms. Alexander further indicated that Plaintiff must be able to walk and stand for eight hours at a time and sit for three hours at a time.  *Id*.

From April 14, 2003 through April 27, 2003, the Plaintiff kept a daily activity log at CNA's request.  AR 0226-39.  These daily activity logs documented pain in Plaintiff's legs and feet.  The logs also stated that Plaintiff engaged in activities like driving, using the computer (usually for about 30 minutes), watering the garden, paying bills, watching television, walking

5

(usually for about 20 minutes), exercising most mornings, sometimes shopping at Home Depot and Costco, visiting people, and taking his children to and from school.  The daily activity logs also mentioned that Plaintiff had trouble sleeping at night due to pain and needed to rest during the day.

On April 17, 2003, Dr. Easter completed a Functional Assessment Tool for CNA.  AR 0253.  In completing that form, Dr. Easter indicated that he did not feel that Plaintiff could stand and walk for approximately eight hours a day, sit for three hours a day, use the computer and telephone, or talk with customers and other salespersons throughout the day.  *Id*.  Dr. Easter explained that Plaintiff's activities were limited by severe muscle aches which prevent full range of motion and most activities.  *Id*.  Dr. Easter was uncertain as to when Plaintiff could return to work and noted that the Mayo Clinic physician was Plaintiff's main evaluating physician.  *Id*.

From April 24, 2003 through April 26, 2003, a CNA investigator conducted a video surveillance of Plaintiff which lasted a total of approximately two hours.  AR 0240.  The surveillance video tapes showed the Plaintiff  "walking, driving, lifting and carrying a large box, utilizing a blower, bending at the waist, lifting a toolbox, entering a truck, squatting and washing a vehicle."  AR 0209.  Plaintiff also "appeared to ambulate in a normal manner."  *Id*.  The investigator then interviewed the Plaintiff on May 5, 2003 regarding the surveillance observations.  The investigator noted that during the interview Plaintiff had to take periodic breaks and "[a]t times, he appeared uncomfortable...."  AR 0241.  The Plaintiff told the interviewer that he tried to work part-time from August 2002 through October 2002 but "had to leave because of stress related issues" and he had missed three continuous weeks of work.  Ar 0242.  The Plaintiff stated that he was not currently working.  *Id*.  The investigator observed that Plaintiff's daily activity

6

logs did not mention certain activities depicted on the surveillance videotapes like "unloading of boxes from the Ford Expedition, carrying a lawn blower, and lying on the pavement, while looking under a Jaguar," and "lifting of a heavy tool box from the bed of a pickup truck, and the hopping up onto and the jumping down from the bed of this same truck."   AR 0243-44.  The Plaintiff further told the investigator that he has "good days" and "bad days."  AR 0244.   In addition, Plaintiff expressed an interest in working at least part-time in a position such as training sales personnel and new hires that would be less stressful than his work as a used car salesmanager.  *Id.*

   On May 22, 2003, CNA's Independent Physician, Dr. Eugene Truchelut, conducted a review of Plaintiff's medical record.  Dr. Truchelut summarized the physical demands of Plaintiff's job at Turner as follows:

> claimant spent most of this 12-14 hour workday standing and walking, with a total of 2 hours of sitting.  No lifting/carrying or pushing/pulling was involved, but postures such as stooping, kneeling, crouching, grasping, reaching, twisting, and bending at the waist were constantly utilized.  There was some exposure to mechanical items, but none to hazardous environments.  As part of this job, the claimant used a telephone, computer, and calculator, and he would operate the motor vehicles.

AR 0189.  Dr. Truchelut's review included a description of Plaintiff's daily activities and the surveillance video tapes of Plaintiff.  Dr. Truchelut characterized Plaintiff actions in the surveillance video tapes as "smooth and unencumbered." AR 0191.  Dr. Truchelut further found that there was no objective medical evidence to support a limitation on Plaintiff's ability to perform his occupation.  *Id.*  Based on his review of the record, Dr. Truchelut concluded that Plaintiff was not disabled.  *Id.*

After Dr. Truchelut concluded that Plaintiff was not disabled, a CNA Group Benefits Universal Physician Review Form dated May 23, 2003 nonetheless stated that Plaintiff could not "sit for more than 40 minutes at a time and he [could not] stand for more than 10 to 15 minutes at a time."  AR 0196.  This document also stated that "Dr. Easter indicates claimant [is] unable to perform occupational duties of standing and walking approximately 8 hours per day, sitting for 3 hours per day and using the computer and telephone as needed due to severe muscle aches that prevent full range of motion and most activities."  *Id.*  Finally, this document referred to the surveillance tapes noting that "[c]laimant was observed doing physical activities such as lifting, bending, lying on the ground, washing a car, walking with his children and working in the yard." *Id.*

On May 28, 2003, Dr. Truchelut interviewed Dr. Easter by telephone even though Dr. Easter did not have Plaintiff's medical record before him.  Dr. Truchelut informed Dr. Easter of the physical demands of Plaintiff's occupation as well as the results from the video surveillance tapes.  Dr. Truchelut then asked Dr. Easter "what findings, if any, would support the claimant's being unable to perform his own occupation."  AR 0188.  "Dr. Easter said that would be difficult for him to determine, as he does not believe he has seen the claimant since March."  *Id.*  Dr. Easter went on to state that

> he did not remember any physical findings on the examination of the claimant which would contradict what was seen on the video tape in the way of physical activity, that is there were no neurological deficits or muscular changes such as atrophy and fasciculations.  He did not recall any gait disturbances.  He wondered whether the claimant might have an anxiety or depression component to his symptoms, but said he could offer no update on the claimant's situation, since he had not seen him in over 2 months.

*Id.*

On June 5, 2003, CNA issued a letter denying Plaintiff LTD benefits. In that letter, CNA summarized the physical demands of Plaintiff's job at Turner as a sales manager. Those physical demands included being able to walk around a seven acre dealership, get in and out of cars, work between 12 and 14 hours a day, stoop, kneel, crouch, and climb. AR 0184. CNA further stated in the letter that Dr. Truchelut had reviewed the Plaintiff's medical record, Plaintiff's daily activity logs, the surveillance report and statement of daily activities, and the May 27, 2003 telephonic interview of Dr. Easter. *Id*. CNA also stated that there was no objective medical evidence precluding the Plaintiff from performing his occupational duties. *Id*. CNA then summarized the video surveillance tapes as follows:

> On April 24, 2003, you were observed by video surveillance performing the following physical activities: driving, loading two large boxes from your vehicle, sweeping the driveway, carrying a lawn blower, walking down the street with your children, walking to a strip mall, bending at the waist to open the hood [of] a car, pushing on the hood of the car to close it, lying on the ground and looking under the car, bending at the waist to open the trunk and lifting a tool box. The following day, April 25, 2003, you were observed driving, climbing in the back of a pickup truck, lifting a toolbox into the truck, carrying the same toolbox into the garage and walking. On April 26, 2003, you were observed dragging a water hose across the street to wash two cars for approximately 25 minutes each, detailing the car-including 20 minutes detailing the tires and rims, walking, driving and lifting your child into the car.

AR 0185. In discussing the telephonic interview with Dr. Easter, CNA noted that Dr. Easter stated "that he did not recall that [Plaintiff] had any physical findings, neurological deficits, gait disturbances or muscular changes on examination that would contradict the physical activities that were observed on April 24, 25, and 26, 2003." *Id*. CNA concluded that based on the medical reports, the video surveillance, and Dr. Easter's telephonic interview, it appeared the Plaintiff could perform the physical activities his occupation at Turner required. *Id*. Plaintiff effectively appealed that decision on July 14, 2003. *See* AR 174.

9

On August 8, 2003, the Plaintiff saw Dr. James Rice, a pain specialist.  Dr. Rice observed that Plaintiff was anxious appearing and exhibited "pain behavior" during the physical examination. AR 0082.  Dr. Rice concluded that Plaintiff "has a significant pain syndrome complicated by his anxiety and depression by his own admission."  AR 0083.

On August 11, 2003, Billy Cappelle, Plaintiff's former supervisor at Turner, wrote a letter stating that Plaintiff would have to leave work "after becoming extremely exhausted and in great pain in only a few hours."  AR 0165.  Mr. Cappelle further stated that "[w]e would like nothing more than to reinstate his position, but at this time, he is unable to perform at the level of management required."  *Id.*

Plaintiff saw Dr. Rice again on August 27, 2003.  The Plaintiff advised Dr. Rice that he was considering limited part-time work. AR 0084.  Dr. Rice noted that

> [t]he patient is very interested in making progress towards return to work.  I have supported him in this regard but cautioned him to proceed with this trial in a graded [sic] fashion to avoid any significant exacerbation of his pain syndrome.  I believe it is reasonable for the patient to proceed with this trial of return to employment to see to what extent he may be able to make progress.  He was advised that he is not fully recovered at this time, and thus he will need to observe for exacerbation and recurrence of his more severe condition.

*Id.*

On August 28, 2003, Dr. Easter wrote that Dr. Rice was seeing Plaintiff for physical medicine rehabilitation.  AR 0076.  Dr. Easter noted that "Dr. Rice feels that the patient is not fully capable to return to his previous level of employment.  However, the patient is working part time." *Id.*

Danny Voight of Danny Voight's Auto Center wrote a letter on August 30, 2003 stating that he would offer Plaintiff part-time employment beginning September 2003. AR 0166.  Mr. Voight stated that he knew Plaintiff was "unable at this time to work full time, where he tires

10

easily and commission sales be can [sic] financially stressful itself." *Id*.  Consequently, Mr. Voight

planned on stationing Plaintiff in an office in order "to relieve physical exertion." *Id*.

On October 12, 2003, Dr. Truchelut submitted an opinion to CNA regarding his review of

additional materials included in Plaintiff's medical record.  Those additional materials consisted of

Dr. Rice's August 8, 2003 report and Dr. Easter's August 28, 2003 letter.  AR 0159.  Dr.

Truchelut rejected Dr. Rice's August 8, 2003 report because "Dr. Rice did not address

occupational functional capacity or specific work restrictions" and Dr. Rice's findings are "semi-

objective at best, and as such do not support a marked reduced functional capacity."  AR 0159-

60.  Dr. Truchelet still did not find Plaintiff disabled.

On November 5, 2003, Plaintiff received a letter from Robert Troxell, a registered nurse

employed by CNA, rejecting Plaintiff's appeal of CNA's decision to deny him LTD insurance.

Mr. Troxell found that although Plaintiff suffers from fibromyalgia, Plaintiff could nonetheless

perform the material and substantial duties of his regular occupation. AR 153.  Mr. Troxell

explained that

> the totality of the information obtained/offered essentially illustrates an overall, residual functional capacity equal to [or greater than] that, which is required of you to perform the essential duties of your regular occupation.  This evaluation is based on the review of all the information provided/obtained, to include documented, [sic] telephonic interviews as held between you and the Company, written diaries/daily ledgers completed and provided by you, the results and findings as a result of the face-to-face interview as held between you and a representative from the Company, the actual findings on physical and neurological examinations as documented, observed, and provided by your treating medical professionals, the functional capacity as depicted in conducted video surveillance, the evaluation of the results of an independent peer review, and other written and oral communications as provided by your treating, attending, and consulting physicians.

AR 0153-54.

11

From November 6, 2003 through June 8, 2004, the Plaintiff saw Dr. Richards, a psychotherapist, for psychological treatment to better manage Plaintiff's pain, depression, and stress resulting from Plaintiff's physical illness. AR 0054-65. Plaintiff made mostly average progress towards achieving his treatment goals. AR 0054-58.

In December 2003, the Plaintiff began seeing Dr. Philip Jameson. AR 0091. On June 2, 2004, Dr. Jameson stated that "[i]t is not an exaggeration to say [that Plaintiff's] illness significantly diminishes his quality of life." *Id*. Dr. Jameson further wrote that Plaintiff "has been unable to work in his capacity as a finance officer. Treatment to date has not improved his symptom complex." *Id*. Dr. Jameson then concluded that "[g]iven the ever-present pain and fatigue, I cannot conceive of his being able to work at this time." *Id*.

On November 7, 2004, the Social Security Administration awarded Plaintiff social security disability benefits and found Plaintiff disabled as of May 1, 2004.

B. Standard of Review

The parties agree that the LTD insurance plan grants CNA discretion to determine whether benefits are payable. In that situation, the Court applies an arbitrary and capricious standard to review the denial of benefits. *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004). When the Court reviews a denial of benefits using the arbitrary and capricious standard, the Court is limited to the administrative record as compiled by the insurer in the course of deciding to deny benefits. *Id*.

The arbitrary and capricious standard, however, is modified to a "sliding scale" standard when there is a conflict of interest between the insurer and the insured. *Id*. "[A] conflict of interest triggers a less deferential standard of review." *Id*. When there is an inherent conflict of

12

interest such as in this case where the insurer is also the administrator of the insurance plan, the

burden shifts to the insurer to establish "that its interpretation of the terms of the plan is

reasonable and that its application of those terms to the claimant is supported by substantial

evidence." *Id*. at 1006. "Substantial evidence is such evidence that a reasonable mind might

accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial

evidence requires more than a scintilla but less than a preponderance." *Sandoval v. Aetna Life*

*and Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)(internal quotation marks omitted). The

Court must, in other words, "take a hard look at the evidence and arguments presented to the plan

administrator to ensure that the decision was a reasoned application of the terms of the plan to the

particular case, untainted by the conflict of interest." *Fought*, 379 F.3d at 1006. In sum, "when

an inherent conflict of interest [exists] ... and the plan administrator has denied coverage, the

district court is required to slide along the scale considerably and an additional reduction in

deference is appropriate." *Id*. at 1007.

C.  Discussion of Relevant Evidence

        CNA argues that the substantial and material duties of Plaintiff's job as a used car sales

manager were mostly sedentary in nature and that the administrative record demonstrates that

Plaintiff could perform the substantial and material duties of a used car sales manager. CNA

bases this argument in part on Plaintiff's daily activities such as walking, cleaning the garage,

selling cars, exercising, doing household chores, driving, and using a computer. CNA further

notes that Dr. Easter 1) provided no facts to support his conclusion that Plaintiff could not walk

or stand for eight hours, 2) Dr. Easter failed to describe how the fibromyalgia affected Plaintiff's

ability to work because Dr. Easter did not consider Plaintiff's work requirements, and 3) Dr.

Easter provided no "objective medical findings" to support his conclusion that Plaintiff was not able to work as a used car sales manager.  CNA also points to the video surveillance of Plaintiff as proof that Plaintiff can work as a used car sales manager and to Dr. Easter's statement that he did not know of any limitations on Plaintiff which would prevent him from performing the activities shown on the video surveillance tapes.  Moreover, CNA observes that an independent medical reviewer found no disability after reviewing Plaintiff's medical records, interviewing Dr. Easter, and viewing the surveillance video tapes.  Finally, CNA notes that Plaintiff was able to work part-time.

Plaintiff argues that a fair and full review by CNA of Plaintiff's claim for LTD insurance benefits would have included an interview with Dr. Hogan and an independent medical examination.  In addition, Plaintiff argues that CNA unreasonably disregarded his subjective complaints of pain. The Plaintiff also notes that although CNA granted short term disability benefits to Plaintiff CNA became reluctant to grant Plaintiff LTD benefits which would have entailed a greater financial loss to CNA than the award of short term disability benefits for only a few months.  Finally, the Plaintiff observes that the Social Security Administration found Plaintiff totally disabled on Plaintiff's initial application for social security benefits.

1.  CNA's Allegation That Plaintiff's Job as a Used Car Sales Manager was Sedentary in Nature

Plaintiff presented evidence to CNA that his job as a used car sales manager required much standing and "running around."  AR 0077, 0298.  Plaintiff further noted that he was working 10 to 12 hour days.  AR 0077.  Ms. Alexander corroborated Plaintiff's statements when she filled out a Physical Demands Analysis which indicated that Plaintiff's job required that he

walk seven acres, walk and stand for eight hours at a time, sit for three hours a day, and work 12

to 14 hours a day.  AR 0263.  Interestingly, CNA used Ms. Alexander's Physical Demands

Analysis in the Functional Assessment Tool given to Dr. Easter to complete.  Moreover, Dr.

Truchelut, in summarizing the physical demands of Plaintiff's job, stated that "claimant spent most

of this 12-14 hour workday standing and walking, with a total of 2 hours of sitting."  AR 0189.

The above evidence is hardly substantial evidence that Plaintiff's job as a used car sales manager

was sedentary in nature.

     2.  Plaintiff's Reported Daily Activities

     Although Plaintiff stated that he had "good" and "bad" days, Plaintiff's reported daily

activities appeared to consist of sporadic bursts of activity followed by periods of resting.  Even

so, Plaintiff's ability to walk was limited to only about 20 to 25 minutes.  These activities are not

consistent with being able to spend most of a 12 to14 hour workday standing or walking as

Plaintiff was required to do at Turner.  Plaintiff's reported daily activities, therefore, do not

constitute substantial evidence that Plaintiff could return to his previous employment at Turner.

     3.  Dr. Easter's Opinion That Plaintiff is Disabled

     Contrary to CNA's general assertion that Dr. Easter had not considered Plaintiff's physical

work requirements, Dr. Easter's April 17, 2003 Functional Assessment Tool was based on the

level of physical functionality provided by CNA which, in turn, was based on Ms. Alexander's

assessment of the physical demands of Plaintiff's job.  Even so, Dr. Easter appeared to base his

opinion of disability only on Dr. Hogan's diagnosis and Plaintiff's subjective complaints.  Dr.

Easter, however, made it clear on at least two occasions that Dr. Hogan should be consulted

regarding Plaintiff's fibromyalgia.  In fact, no one at CNA contacted Dr. Hogan for his opinion on

whether Plaintiff could return to work.  Additionally, although an independent reviewer, Dr. Truchelet, found Plaintiff not disabled, CNA never undertook an independent medical examination of Plaintiff.  Where a conflict of interest exists, obtaining an independent medical examination constitutes evidence of a thorough investigation. *See Fought*, 379 F.3d at 1015 (citations omitted).  An independent medical examination is even more important when an uncommon or controversial disease is at issue.  *See id.*  (citation omitted).  In this case, "[f]ibromyalgia is a controversial diagnosis because it is diagnosed entirely from a patient's self-reports of pain and reported symptoms." *Reeves v. UNUM Life Ins. Co. of America*, 376 F.Supp.2d 1285, 1295 (W.D. Okla. 2005).  Considering that CNA failed to contact Dr. Hogan and failed to obtain an independent medical examination of Plaintiff, the Court finds that CNA did not conduct a thorough investigation of Plaintiff's physical limitations.  This lack of a thorough investigation of Plaintiff's physical limitations is particularly egregious in light of CNA's inherent conflict of interest and the elusive nature of fibromyalgia.

      4.  Lack of Objective Medical Evidence

      In this case, CNA does not appear to doubt that Plaintiff actually suffers from fibromyalgia.  CNA argues, however, that there is no objective medical evidence to support Plaintiff's allegation that the intensity of his pain prevents him from returning to his job as a used car sales manager.  It is not uncommon for courts to look to social security cases for guidance in addressing this type of argument.  *Sanderson v. Continental Casualty Corporation,* 279 F.Supp.2d 466, 475 (D. Del.); *Conrad v. Continental Cas. Co.*, 232 F.Supp.2d 600, 604 (E.D. N.C. 2002).  *See also Torix v. Ball, Corp.*, 862 F.2d 1428, 1431 (10th Cir. 1988)(using social security law as helpful analogy in ERISA case).  In Tenth Circuit social security cases, the analysis

of whether a claimant's alleged pain rises to the level of disabling pain involves three steps:  "(1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."  *Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995)(citations omitted).  Under this standard, the only objective medical evidence that Plaintiff is required to produce is objective evidence of a pain producing impairment.  The Plaintiff has sufficiently done that by submitting documentation of a diagnosis of fibromyalgia.[2]

CNA, however, cites to *Jones v. Continental Cas. Co.*, 35 F.Supp.2d 1304 (D. Kan. 1999) as an ERISA case where the lack of objective medical evidence regarding pain led to a decision in favor of CNA.  *Jones*, however, is distinguishable from this case in several ways.  First, the standard of review in the *Jones* case was *de novo* instead of arbitrary and capricious based on a sliding scale.  *See id.* at 1306.  Second, unlike the plaintiff's treating physician in *Jones* who placed only "minor physical restrictions" on the plaintiff, none of Plaintiff's treating physicians placed "minor physical restrictions" on Plaintiff.  *Id.* at 1308.  Third, in *Jones*, the plaintiff's treating physician was unaware of the nature and extent of the duties required by the plaintiff's occupation, whereas CNA, in this case, provided Dr. Easter with Plaintiff's job duties in

---

[2]In fact, there is no laboratory test to gauge the severity of fibromyalgia.  *Moore v. Barnhart*, 114 Fed. Appx. 983, 991 (10th Cir. 2004).  It is also noteworthy that none of Plaintiff's physicians doubted Plaintiff's reports of severe pain or opined that Plaintiff was somehow a malingerer.  Plaintiff's desire and actual attempts to work is additional evidence that Plaintiff was not malingering.

the Functional Assessment Tool.  *Id.*   Interestingly, the *Jones* court stated that

> [t]he court does not, by its decision, intend to suggest that a claimant is required to provide "objective" medical evidence such as x-rays or blood tests to support a claim for total disability benefits.  Indeed, there are certain diseases whose symptoms do not manifest themselves in the form of measurable, recordable, objective data.  Instead, the court merely finds, based on the record before it, that plaintiff has failed to establish that her medical condition prevented her from executing her duties as a technical drafter.

*Id*. at n.3.  In sum, the Court finds that the lack of objective medical evidence regarding the severity of Plaintiff's pain fails to constitute substantial evidence that Plaintiff is not disabled within the meaning of the LTD insurance plan.

     5.  The Surveillance Tapes

     CNA's use of the surveillance tapes as substantial evidence that Plaintiff could return to his job as a used car sales manager is troubling, especially in light of CNA's inherent conflict of interest.  The Court notes that these tapes totaled only two hours and spanned a three day period, thereby constituting a very brief peek into Plaintiff's life.  Such a limited glance of Plaintiff's life is not necessarily representative of a "typical" day for Plaintiff.  Moreover, the tapes do not show what the Plaintiff was doing in his home where he could very well have been resting as he claimed he did in his daily activity logs.  Although Plaintiff admitted that he sometimes has "good" days and Dr. Easter commented that Plaintiff's condition did not limit Plaintiff's ability to perform the actions recorded in the surveillance tapes, those tapes do not constitute substantial evidence that Plaintiff could be as active as he is shown in the tapes throughout a 12 to 14 hour workday for five or six days a week.

6.   Plaintiff's Ability to Work Part-Time

Plaintiff did work part-time from August 2002 through October 2002 at Turner but was

unable to continue working due to the stress and actually missed three continuous weeks of work.

AR 0242.  Plaintiff was apparently working part-time again in August or September 2003 but

under less physically demanding circumstances than at Turner.  The administrative record does

not indicate if Plaintiff still works part-time or has had to quit his employment due to the

fibromyalgia.  Although CNA argues that Plaintiff's ability to work part-time indicates that

Plaintiff is not disabled, one could view the part-time employment as a good faith attempt by

Plaintiff to overcome the limitations of the fibromyalgia and to not be dependent on LTD

insurance or social security benefits.  Of course, as mentioned, Plaintiff was not able to maintain

his part-time employment in the fall of 2002 and the administrative record is silent as to how well

Plaintiff was able to maintain his part-time employment in August or September 2003. Plaintiff's

part-time work history just does not rise to the level of substantial evidence that Plaintiff could

return to his job as a used car sales manager working 12 to 14 hour workdays five or six days a

week.

7.   CNA's Grant of Short Term Disability Benefits.

CNA granted Plaintiff short term disability benefits after having found that Plaintiff met

the definition of disability under the CNA policy for short term disability insurance.   That

definition required that the Plaintiff be "continuously unable to perform the *Material and*

*Substantial Duties* of [Plaintiff's] *Regular Occupation.*"  AR 0041.  As noted previously, this is

the same definition of disability used in the LTD insurance policy.  In deciding to deny LTD

insurance benefits, CNA, therefore, found that Plaintiff did not meet the definition of disability

19

which he had already met in order to obtain short term disability benefits.  CNA, however, does

not provide evidence that Plaintiff's condition has actually improved since Plaintiff first became ill

thereby justifying a subsequent finding of not disabled.  Considering CNA's inherent conflict of

interest, the Court finds that CNA's decision to reverse its disability determination when Plaintiff

requested LTD benefits is suspect and constitutes evidence of an inherent conflict of interest.

      8.  The Social Security Determination of Disability

      Plaintiff's social security determination of disability occurred after the administrative

record was complete in this case.  Since that determination of disability was not before CNA, the

Court is not obliged to consider that determination of disability in reviewing the administrative

record.

**D.  ERISA Remedies**

      The Court concludes that because of CNA's inherent conflict of interest, CNA has failed

to carry its burden of demonstrating that its decision to deny LTD benefits was supported by

substantial evidence and therefore, not arbitrary and capricious.  The next issue then is whether

the Court should order CNA to reinstate Plaintiff's LTD insurance benefits or whether the Court

should remand the case to CNA for further consideration of the merits of Plaintiff's claim for

LTD insurance benefits.

> The remedy when an ERISA administrator fails to make adequate findings or to explain
> adequately the grounds of her decision is to remand the case to the administrator for
> further findings or explanation.  A remand for further action is unnecessary only if the
> evidence <u>clearly shows</u> that the administrator's actions were arbitrary and capricious, or
> "the case is so clear cut that it would be unreasonable for the plan administrator to deny
> the application for benefits on any ground."

*Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1288 (10th Cir. 2002)(citations

omitted)(emphasis added).  In this case, CNA's failure to completely investigate Plaintiff's claim, i.e., CNA's failure to contact Dr. Hogan and obtain an independent medical examination, require a remand in order for CNA to make further findings.  In addition, CNA should revisit the other shortcomings (as discussed above) in its review of the administrative record, especially in light of CNA's inherent conflict of interest.  Finally, CNA should review any new evidence Plaintiff wishes to submit as well as Dr. Jameson's June 2, 2004 report and Dr. Richard's reports which CNA did not consider in making its final determination on November 5, 2003.

E.  Plaintiff's Request for Attorney's Fees and Costs

Plaintiff's request for attorney's fees and costs was presented in Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment or in the Alternative for Judgment on the Administrative Record (Doc. No. 61), but it should be made in a separate motion with supporting documentation.  Consequently, Plaintiff's present request for attorney's fees and costs will be denied at this time.  However, it may be later renewed in accordance with the Local Rules of the United States District Court, the Federal Rules of Civil Procedure, and any applicable ERISA law.

IT IS ORDERED that:

1.  Defendants' Motion for Summary Judgment or in the Alternative for Judgment on the Administrative Record (Doc. No. 28) is denied;

2.  this case is remanded to CNA for further findings consistent with this Memorandum Opinion and Order; and

3.  Plaintiff's request for attorney's fees and costs is denied at this time.


_____

SENIOR UNITED STATES DISTRICT JUDGE